**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| **SHELLY BLAKELY,** | ) | **CIVIL ACTION NO. 08-CV-00214** |
| | ) | |
| **Plaintiff,** | ) | **MAGISTRATE JUDGE** |
| | ) | **STEVEN L. CROCKER** |
| **v.** | ) | |
| | ) | |
| **ALSCO METALS CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

**DEFENDANT ALSCO METALS CORPORATION'S**
**REPLY MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

---

Keith L. Pryatel, Esq. (0034532)
kpryatel@kwwlaborlaw.com
John W. McKenzie, Esq. (0059266)
jmckenzie@kwwlaborlaw.com
Thomas Evan Green, Esq. (0075022)
tgreen@kwwlaborlaw.com
KASTNER WESTMAN & WILKINS, LLC
3480 West Market Street, Suite 300
Akron, OH 44333
330-867-9998 (Phone)
330-867-3786 (Fax)

Andrew M. Norman, Esq.
anorman@quarles.com
QUARLES & BRADY
33 East Main Street, Suite 900
Madison, WI 53703
608-283-2634 (Phone)
608-294-4974 (Fax)

Counsel for Defendant,
Alsco Metals Corporation

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

I.   INTRODUCTION ................................................................... 1

II.   LAW AND ARGUMENT ..................................................... 2

    A.   Plaintiff's Material Breaches of the Release ............................... 2

        1.   Contractual Consideration ............................................... 2

        2.   Plaintiff's Post-Release Claim Misrepresentation ........................... 3

        3.   The Claimed Absence of "Damages" .............................. 4

    B.   Plaintiff's "Overtime" Wage Claims ............................................. 8

        1.   Wisconsin "Overtime" Claims are Waivable .................................. 8

        2.   Genuinely Disputed FLSA Claims are Subject to Private Compromise ........................................................ 9

        3.   The "Merits" of Plaintiff's Overtime Wage Claim ........................... 10

            a.   Defendant's extraordinary efforts to stop Plaintiff from engaging in "off-the-clock" overtime .......................... 10

            b.   The laptop evidence ........................................... 12

            c.   Plaintiff's e-mail trafficking ................................... 13

            d.   The absence of FLSA "willful" violations ............................ 18

III.   CONCLUSION ................................................................... 19

CERTIFICATE OF SERVICE ........................................................ 20

## I.     __INTRODUCTION.__

To shed her material, multiple breaches of the Release and Settlement Agreement, Plaintiff engages in ostrich-like defensive tactics and a textual argument reminiscent of Alice in Wonderland.[1]   Thus, Plaintiff altogether ignores the legal consideration derivative of her previous lawyer's alteration of Alsco's Standard Release and Severance Agreement,[2] and ignores the equally undisputed fact that Defendant was forced to defend itself against admittedly waivable and releasable FLSA retaliation claims brought and pursued by Plaintiff.[3]

With respect to her separate FLSA/Wisconsin overtime claims, Plaintiff readily concedes that she was expressly told she was not permitted to work unauthorized overtime at work or outside the office (Def. PFF No. 15); was told not to perform "off the clock" work on her Alsco laptop computer (Def. PFF No. 16); was told that performing any unauthorized overtime was prohibited as part of Alsco's workplace policies (Def.

---

[1] The Release and Settlement Agreement clearly stated:  "Any and all facts, circumstances and events occurring prior to the signing of this Agreement cannot be used by Employee as part of any future proceeding against the Released Parties" (Def. PFF No. 223, p. 6).  Although Plaintiff's Complaint, First Amended Complaint, and Second Amended Complaint are replete with pled "…facts, circumstances and events occurring prior to the signing of this Agreement", Plaintiff argues:  "Once again, Blakely is not relying on facts that occurred before the signing of the Agreement as the basis of her claims; she is simply using those facts as background to show how the claim arose" (Pl. Opp. Br., p. 23):

> "I don't know what you mean by 'glory'", Alice said.

> Humpty Dumpty smiled contemptuously.  "Of course you don't – 'til I tell you….  When I use a word", Humpty Dumpty said in a rather scornful tone, "it means just what I choose it to mean – neither more nor less".

Louis Carroll, *Through The Looking Glass*, in the Complete Works of Louis Carroll, 154, 196 (1994).

[2] Def. PFF Nos. 220-223.  "Consideration may exist of either a detriment to the promisee or a benefit to the promisor".  *Lake Land Employ. Group of Akron, LLC v. Columber* (2004), 101 Ohio St. 3d 242, 246.

[3] Def. PFF Nos. 234-238, 244-247.  Plaintiff's claim that Alsco has not demonstrated "damages" to bolster a *bona fide* breach (Pl. Opp. Br., p. 17) runs headlong into Ohio's jurisprudence that nominal damages must be awarded whenever there is an identifiable contractual "breach".  *DeCastro v. Wellston City Sch. Dist.* (2002), 94 Ohio St. 3d 197, 202.

PFF No. 20); was stripped of her laptop computer in an effort to prevent Plaintiff from performing unauthorized overtime (Def. PFF No. 22); and was expressly directed by Alsco Human Resources officials "…not to take work home, or to perform work 'off-the-clock'" (Def. PFF No. 203).  And, as demonstrated *infra*, the cited deposition testimony of Plant Manager Craig Gilliam does not bear the evidentiary weight of his having "constructive knowledge" of Plaintiff's unauthorized overtime (See, Pl. Resp. to Def. PFF, *citing* Gilliam Dep. 52-53).

For the reasons set forth in Defendant's Opening Memorandum of Law, and those here, Alsco is entitled to judgment as a matter of law.

**II.   LAW AND ARGUMENT.**

    **A.   Plaintiff's Material Breaches of the Release.**

        **1.   Contractual Consideration.**

Without repeating the substantial legal consideration identified in Defendant's opening memorandum of law,[4] Plaintiff is noticeably silent about the legal effects of her lawyer negotiating to have two separate clauses of Alsco's standard Release and Severance Agreement excised from the bargain (Def. PFF Nos. 219-223).  Since Ohio courts will "…not inquire into the adequacy of consideration", and since "consideration may consist of either a detriment to the promise or a benefit to the promisor"[5], it is not genuinely disputed that legal consideration indeed bolsters the Release and Severance Agreement that Plaintiff's lawyer helped negotiate and construct.

---

[4] Def. MSJ Br., pp. 3-4.

[5] *Lake Land Employ. Group of Akron, LLC v. Columber* (2004), 101 Ohio St. 3d 242, 246, 248.

Let's not also forget that Plaintiff retains $19,922.00 in separation pay that she and her lawyer conceded in the Release and Severance Agreement to be monies "…which employee is not otherwise entitled to receive" (Def. PFF Nos. 223, Exh. "B", p. 1).  Plaintiff's citation to *Bolling v. Clevepak Corp.* (Erie App. 1984), 20 Ohio App. 3d 113, for the proposition that severance benefits are vested and an entitlement in the state of Ohio is uninstructive.   In *Bolling*, the court observed that the particular severance benefit plan at issue was one "…evincing an intent to furnish severance pay *when the employees fulfilled the conditions stated therein*".   *Id.* at p. 119.   Here, in contrast, the signing and adherence to a general release was admittedly a condition precedent to the receipt of Alsco's severance benefits (Def. PFF No. 211), and that condition precedent has admittedly not been met by Plaintiff (Def. PFF Nos. 229-230).

### 2. Plaintiff's Post-Release Claim Misrepresentation.

Seizing upon the Release's supposed limitation to matters "…at or prior to the date hereof", Plaintiff tells the Court that all of her identified breaches were permissible purportedly because "…these claims relate to matters that occurred after the signing of the agreement" (Pl. Opp. Br., p. 24).  That, however, is untrue!  One of Plaintiff's pled retaliation claims in her First Amended Complaint was specifically linked to the allegation that "…Defendant forced Plaintiff to release her pending overtime claim in order to receive her severance package" (Def. PFF Nos. 237, 238).  Another legally waivable retaliation claim was predicated on the notion that "…Defendant retaliated against Plaintiff by conditioning the receipt of severance payments upon the release of Plaintiff's pending overtime claim in order to receive her severance package" (Def. PFF Nos. 237, 238).  All three versions of Plaintiff's Complaints plead:

> 30. Because of Defendant's threat to deprive Plaintiff of the severance money, and the fact that Plaintiff was currently unemployed and not in a financial position to refuse the terms of the severance, Plaintiff felt that she had no choice to sign the Agreement and relinquish her pursuit of the [Wisconsin] Labor Standards Complaint at that time.   Indeed, Plaintiff reluctantly signed the Severance Agreement on August 2, 2007.

(Def. PFF No. 235, Exhs. 20, 22, p. 5, ¶ 30).   All of these allegations, pled facts, and matters relate to facts and events that occurred prior to Plaintiff's signing of the Release and Severance Agreement, and thus constitute stark breaches of that Agreement.

To extricate herself from her multiple breaches, Plaintiff professes that she "…is not relying on facts that occurred before the signing of the Agreement as the basis of her claims; she is simply using those facts as background to show how the claim arose" (Pl. Opp. Br., p. 23).   Unfortunately, the clear and unambiguous text of Plaintiff's negotiated Release and Severance Agreement does not draw distinctions between predicate or mere "background" pre-existing facts:  "Any and all facts, circumstances and events occurring prior to the signing of this Agreement cannot be used by Employee as part of any future proceeding against the Released Parties" (Def. PFF No. 223, p. 6).   Thus, whether used as the predicate basis to bolster two of her previously pled retaliation claims, or as "background" noise for all three versions of her various filed complaints, Plaintiff materially breached the Release and Severance Agreement.

### 3.    The Claimed Absence of "Damages".

To emancipate herself from the Release and Severance Agreement's requirement that Plaintiff remit back to Alsco the thousands of dollars of separation pay received on the condition of her adhering to the general release in that same

agreement,[6] Plaintiff argues that no "breach" occurred because Also has not established "damages":

> Alsco has not established that they have suffered any damages arising out of Blakely's alleged breaches – in fact, Alsco does not make any allegation about what damages Alsco alleges to have suffered in their Memorandum in Support of its Motion for Summary Judgment.

* * *

> Assuming *arguendo* that it is found that the retaliation claimed or the declaratory and injunctive relief claims are considered breaches, which as argued below, they are not, Alsco has not proven any damages originating specifically from those breaches.

(Pl. Opp. Br., pp. 17-18).  Plaintiff's opposition proposition is both legally and factually in error.

The Ohio Supreme Court has expressly held that once a contractual commitment is violated, a "breach" has occurred and the non-breaching party is entitled to court-ordered nominal damages even where in fact damages cannot be demonstrated:

> The question certified by the court of appeals asks "whether nominal damages can be recovered where actual monetary damages cannot be proven in a breach of contract claim."  It is established, both by our controlling precedent in *First Natl. Bank of Barnesville* and multiple legal treatises, that the answer to this question, strictly speaking, is in the affirmative.  See Williston on Contracts (3 Ed. 1968), Section 1339.  (An unexcused failure to perform a contract is a legal wrong.  Action will lie for the breach although it causes no injury.  Nominal damages are then awarded.");  See, also, 3 Restatement o the Law 2d, Contracts 91981), Section 346 ("[1] The injured party has a right to damages for any breach by a party against whom the contract is enforceable unless the claim for damages has been suspended or discharged. [2] If the breach caused no loss or if the amount of the loss is not proved under the rules stated in this Chapter, a small sum fixed without regard to the amount of loss will be awarded as nominal damages.").

---

[6] "In the event a court determines that employee has breached this Agreement…Employee specifically acknowledges that she will return to ALSCO…the Severance Benefit, less $500.00" (Def. PFF Nos. 223, 242, pp. 5-6).

> We affirm that the first paragraph of the syllabus of *First Natl. Bank of Barnesville* only to the extent that we hold that in a case where a plaintiff proves breach of contract at trial but fails to prove actual damages resulting from that breach, the trial court may enter judgment for the plaintiff and award nominal damages.

*DeCastro v. Wellston City School Dist.* (2002), 94 Ohio St. 3d 197, 199.  Accordingly, the breach of a simple confidentiality clause imbedded into a settlement agreement is, in and of itself, enforceable in the state of Ohio even though no identifiable damages exist.  *Wochna v. Mancino* (Summit App. 2008), 2008-Ohio-996, ¶ 15.

Second, Alsco has, in fact suffered demonstrated and undeniable "damages" as a result of Plaintiff's multiple breaches.  Thus, when Plaintiff, subsequent to her signing of the Release and Severance Agreement, went off and filed a Wisconsin administrative retaliation claim (Def. PFF No. 234), Alsco's attorneys invested substantial time responding to that charge.  Similarly, Alsco's lawyers were compelled to research, answer and respond to the twin theories of "retaliation" set forth in Plaintiff's First Amended Complaint (Def. PFF Nos. 235, 237-238, 244; R. 20:Answer to First Amended Complaint ¶¶ 30, 71, 72, 73, 78, 79).  Substantial legal research as to the viability of these "retaliation" claims was undertaken by Alsco's legal counsels as Plaintiff's Second Amended Complaint came literally on the eve of Plaintiff's scheduled deposition (*Id.*; R. 24, 29).  Thus, "damages" in the form of expended legal fees and costs, in and of itself, are clearly associated with Plaintiff's multiple breaches of the Release and Severance Agreement.

Third, Plaintiff's receipt of separation allowance benefits was expressly conditioned on there being no breach of the Release and Severance Agreement via the "…reinstating or instituting any legal or administrative proceedings against the Released

Parties in violation of any provision of this Agreement" (Def. PFF Nos. 223, 242, p. 6). These types of "clawback" provisions placed into a severance benefit agreement are perfectly enforceable as a matter of federal law.  *Rosser v. Raytheon Excess Pension Plan*, 2008 U.S. Dist. LEXIS 89595 (N.D. Tex. 2008) (ordering plaintiff to return $142,155.20 in "actual damages" as a result of breaching severance agreement's covenant not to sue).[7]

Because Plaintiff does not contend that the Release and Severance Agreement is the slightest bit ambiguous; because application of an unambiguous contract is an issue of pure law; and because the Rule 56 undisputed facts establish that Plaintiff breached, and continues to breach the Release and Severance Agreement wholly apart from her pled and pursued "overtime" wage compensation claims, Defendant Alsco is entitled to judgment as a matter of law on its counterclaim, and a court order that Plaintiff remit back the separation allowance benefits receipted under the Release and Severance Agreement. *Brooks v. Timberline Tours, Inc.*, 127 F.3d 1273 (10th Cir. 1997) (affirming summary judgment based upon release and covenant not to sue); *Simpson v. Townsley*, 283 F.2d 743 (10th Cir. 1960) (affirming summary judgment based on covenant not to sue and hold harmless contract); *Rosser v. Raytheon Excess Pension Plan*, 2008 U.S. Dist. LEXIS 89595 (N.D. Tex. 2008) (ordering return of severance where covenant not to sue was breached).

---

[7] In Ohio, a "material" breach occurs whenever the non-breaching party is deprived of the benefit of its bargain.  *State v. Stanley* (Mahoning App. 2002), 2002-Ohio-4372, ¶ 18 (citing *United States v. Castaneda*, 162 F.3d 832, 836 (5th Cir. 1998)).  Once a material breach occurs, the non-breaching party is entitled to "…treat the contract as terminated and rescinded".  *England v. O'Flynn* (Montgomery App. 2002), 2002-Ohio-103, p. 10.  The only benefit of the bargain that Alsco received out of the Release and Severance Agreement was Plaintiff's commitment to release and waive Alsco from all liabilities, including legally waivable "retaliation" claims.

### B.  Plaintiff's "Overtime" Wage Claims.

#### 1.  Wisconsin "Overtime" Claims are Waivable.

Citing to only federal decisional law,[8] Plaintiff summarily concludes that Wisconsin "overtime" wage claims are not subject to waiver or private compromise (Pl. Opp. Br., pp. 1-13).  The federal precedents, however, are largely predicated on § 16 of the FLSA wherein Congress expressly authorized the Secretary of Labor with the authority to supervise payments of unpaid minimum wages or unpaid overtime compensation allegedly due and owing to workers.  29 U.S.C. § 216(c).  Wisconsin's overtime statutory scheme has no comparable FLSA § 16.  Wis. Stat. §§ 103 *et seq.* Thus, the key statutory footer for the federal precedents does not exist at all under Wisconsin's statute.

The Wisconsin courts have refused to blindly march in lock-step with federal precedents where, as here, the underlying statutory language differs.  "We will refuse to interpret provisions of the WFEA in accordance with analogous federal law where the statutory language differs from that of the federal legislation".  *Racine Unified School Dist. v. Labor & Industry Rev. Comm.*, 164 Wis. 2d 576, 587, 476 NW 2d 707, 715 (Wis. App. 1991).  "Clearly, the court is not bound by federal law" where the state and federal statutes differ.  *Crystal Lake Cheese Factory v. Labor & Industry Rev. Comm.*, 264 Wis. 2d 200, ¶ 46, 664 N.W. 2d 651 (2003).  In fact, Wisconsin "…presumes the difference in the language of the federal and state statutes reflects a deliberate choice" for a different

---

[8] *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 65 S. Ct. 895 (1945); *D.A. Schulte v. Gangi*, 328 U.S. 108, 66 S. Ct. 925 (1946); *Walton v. United Consumers Club*, 786 F.2d 303, 306 (7th Cir. 1986); *Lynn's Food Stores v. United States*, 679 F.2d 1350, 1353 (11th Cir. 1982); *McConnell v. Applied Perf. Tech. Inc.*, 2002 U.S. Dist. LEXIS 27598 (S.D. Ohio 2002); *Hampton v. American Plumbing & Sewer*, 1995 U.S. Dist. LEXIS 19373 (N.D. Ill. 1995).

outcome.  *Wisconsin v. Lopez*, 207 Wis. 2d 413, 433, 559 N.W. 2d 264, 271 (Wis. App. 1996).  And, when the Wisconsin legislature wants to make statutory claims to be non-waivable, it makes its position perfectly clear.  Wisc. Stat. § 218.015(6); Wisc. Stat. § 218.0171(6).

Accordingly, Plaintiff's Wisconsin-based "overtime" wage claim is clearly and unequivocally barred by the text of Plaintiff's lawyer-negotiated Release and Severance Agreement.

### 2.    Genuinely Disputed FLSA Claims are Subject to Private Compromise.

Alsco will not unnecessarily burden this Court with a recitation of the legislative history, statutory text, and judicial precedent which holds that federal FLSA claims are subject to private compromise where such compromise is "knowing and voluntary", and where there is a genuine dispute over underlying liability (Alsco MSJ Br., pp. 14-22).  *See also, Martinez v. Bohls Bearing Equipt. Co.*, 361 F. Supp. 2d 608 (W.D. Tex. 2005).  One point, however, needs rebuttal.  Plaintiff contends that the Release and Severance Agreement that she signed cannot be construed as a waiver or compromise of her FLSA "overtime" claim allegedly because it was "…not entered as a settlement of a *bona fide* dispute as to an FLSA claim" (Pl. Opp. Br., p. 3).  Before she signed the Release and Severance Agreement, Plaintiff had already made charges that she was due and owing "overtime" compensation (Def. PFF No. 206).  Alsco denied that asserted liability (*Id.* at No. 207).  Before Plaintiff inked her name to the Release and Severance Agreement on the advice of her then legal counsel, Plaintiff was specifically informed that she should not sign that document if she was desirous of pursuing the already-filed "overtime" administrative charge (Def. PFF Nos. 214, 216).  It is therefore

disingenuous to suggest that there was no present, *bona fide* dispute regarding Plaintiff's "overtime" wage claims that preceded the Release and Severance Agreement, or that the text of the Release and Severance Agreement did not compromise or include such a claim. (*See*, Def. PFF No. 223, p. 1) ("This Agreement is intended to fully and finally resolve any and all claims and disputes, known and unknown, *that exist* or might be claimed to exist by Employee against Alsco…") (emphasis added).[9]

### 3.    The "Merits" of Plaintiff's Overtime Wage Claim.

#### a.    Defendant's extraordinary efforts to stop plaintiff from engaging in "off-the-clock" overtime.

Before examining the two tidbits of evidence[10] that Plaintiff claims demonstrates Alsco's constructive knowledge that she was working unauthorized overtime from her home, Alsco will put into perspective the extraordinary efforts that its managers made to ensure that Plaintiff did not engage in such conduct. *All of these efforts are admitted!*

When Alsco's Plant Manager Craig Gilliam first learned that Plaintiff was performing work-related functions at her home, he pulled Plaintiff aside and informed her (1) she was not permitted to work any overtime at home, and (2) needed Gilliam's permission in advance to perform work outside the confines of the office (Def. PFF No. 15).  Gilliam unearthed that the vehicle Plaintiff was using to perform work out of her residence was an Alsco laptop computer, and so he specifically instructed Plaintiff that

---

[9] Plaintiff's e-mail response to the effect that Wisconsin and/or FLSA claims purportedly could not be privately compromised (Pl. Resp. to Def. PFF No. 227) is answered by the Release and Severance Agreement:  "No party shall be bound by or liable for any alleged representation, promise, inducement, or statement of intention not contained in this Agreement" (Def. PFF No. 223, p. 5).

[10] Plaintiff claims that her access to a laptop computer and Mr. Gilliam's quarterly receipt of e-mails serves to demonstrate Alsco's "constructive knowledge" that she was disobeying her supervisor's orders.

she was no longer authorized to take her laptop computer home, and under no circumstances was she to engage in "off-the-clock" work (*Id.* at No. 16).

Later, at a point in time that ante-dates the liability period in this case, [11] Mr. Gilliam again unearthed the fact that Plaintiff had performed some unauthorized overtime at her residence, and again pulled Plaintiff aside and reminded Plaintiff of their earlier conversation prohibiting that conduct (Def. PFF No. 20).   Gilliam reported Plaintiff's Alsco-prohibited conduct to corporate Human Resources, who then informed Gilliam to take away Plaintiff's laptop computer as a means to prevent her from engaging in "off-the-clock" overtime (Def. PFF Nos. 20-21).   Thereafter, on all subsequent occasions that Plaintiff turned in a self-completed timecard recording workweek "overtime" which had been pre-approved by Gilliam, Plaintiff was compensated at the requisite time and one-half hourly rate of pay (Def. PFF Nos. 118, 119, 129, 131, 132, 139, 144, 150, 160, 168).

Later still, Alsco's Corporate Human Resources became privy to a after-the-fact report that Plaintiff was continuing to work "off-the-clock" overtime at her home, apparently through the use of her personal desktop computer, and again was expressly informed by Alsco's Human Resources Department "not [to] take anything home" (Def. PFF No. 201).   Alsco Human Resources instructed Plaintiff to "stop taking work home", and expressly told Plaintiff that if she was working "…any overtime that she needed to record properly [that fact] on her non-exempt timesheets" (Def. PFF Nos. 199-204).

---

[11] The federal FLSA generally provides a two-year statute of limitations, and the Wisconsin wage payment laws sets forth a firm two-year statute of limitations.  This suit was first commenced on April 15, 2008.  Mr. Gilliam's twin conversations with Plaintiff, and the retrieval of her laptop computer in order to prevent Plaintiff from performing "off-the-clock" work, all occurred in 2004 and 2005 (Def. PFF Nos. 13-16, 20-21).

This conversation occurred before the potential liability period involved in this dispute, and from that point on, Plaintiff turned in hand-completed or electronic timecards on a weekly basis, some of which recorded overtime hours, and others that did not (Def. PFF Nos. 75-193, 199).

It is against this *undisputed* Rule 56 background that Plaintiff contends that Alsco possessed "constructive knowledge" that she continued to disobey its no-overtime work instructions, falsified her time records, and allegedly performed an indeterminable, estimated number of hours of work at her residence, from her personal desktop computer.

### b.   The laptop evidence.

It is ironic that one of the two morsels of evidence that Plaintiff marshals in an effort to raise a genuine issue that Alsco had "constructive knowledge" of Plaintiff's continued off-the-clock overtime is Plaintiff's access to a laptop computer (Pl. Resp. to Def. PFF No. 14; Blakely Aff. ¶¶ 5-7 at R:54-2).  The admitted, uncontested facts with respect to Plaintiff's access to a laptop computer are as follows:

- When Plant Manager Gilliam first learned that Plaintiff might be using her laptop computer to perform work out of the office, he clearly and unequivocally instructed Plaintiff that under no circumstances was she to perform overtime work that was not pre-approved, and under no circumstances was she to take her laptop computer home to perform work, or to perform any "off-the-clock" tasks (Pl. Resp. to Def. PFF Nos. 15-16).

- When Mr. Gilliam acquired later knowledge that Plaintiff was possibly disregarding his no work at home directions, he took the extraordinary step of stripping Plaintiff of her access to an Alsco laptop computer, and forcing her to work solely from an office-supplied desktop computer (Pl. Resp. to Def. PFF Nos. 20-21).

- These events all took place prior to the two-year statute of limitations for even arguable liability that governs this case (Pl. Resp. to Def. PFF No. 20).

Having taken affirmative, active measures to physically stop Plaintiff from performing "off-the-clock" overtime work, the access that Plaintiff once had to an Alsco laptop computer cannot credibly be viewed by this Court as creating a genuine issue of material fact that Alsco had constructive knowledge that Plaintiff continued to disregard her superior's direct orders not to work off-the-clock.

### c.   Plaintiff's e-mail trafficking.

The second evidentiary item that Plaintiff points to in an effort to demonstrate "constructive knowledge" of Plaintiff having worked unauthorized overtime is the claim that periodically Mr. Gilliam would be carbon-copied on e-mails from Plaintiff's home e-mail address (Pl. Resp. to Def. PFF Nos. 14, 15, 20, 104-193).  As records support, Plaintiff references this Court to Mr. Gilliam's deposition (*Id.*).  We'll get to what Mr. Gilliam actually said in his deposition in a moment, but at this juncture it is important for the Court to understand that the federal FLSA is administered on a workweek by workweek basis.  *Reich v. Interstate Brands Corp.*, 57 F.3d 574, 576 (7th Cir. 1995).  Thus, an employee's work hours cannot be averaged over two separate workweeks.  29 C.F.R. § 778.104.   Similarly, any credits that an employer may have against an employee's overtime earnings is determined on a workweek by workweek basis.  *Hower v. City of Springfield*, 274 F.3d 1141, 1148 (7th Cir. 2001).  Accordingly, Plaintiff here must marshal competent, admissible Rule 56 evidence that Alsco had constructive knowledge for each workweek of professed liability that Plaintiff was disregarding her employer's clear directions not to work "off-the-clock"; not to take her once-provided laptop computer home; not to perform any overtime work that was not pre-approved; and not to perform any work that was not properly recorded on her time records (Pl.

Resp. to Def. PFF Nos. 14-15, 20-21, 199-204).  Plaintiff has failed to shoulder this Rule 56 burden.

While Plaintiff cites to Mr. Gilliam's deposition as the Rule 56 record evidentiary basis for her claim that periodic e-mails emanated from her home (and thus Gilliam should have known that Plaintiff was disregarding his explicit directions), Gilliam's deposition in fact supports the fact that he had no knowledge that Plaintiff was working unauthorized overtime hours at her residence:

[By Craig Gilliam]

A.    Done deal.  I thought it was closed.  If the plant manager and the vice president of human resources tell you to not do something, I figured that was closure.

Q.    Did you ever – after you received the phone call from ms. Wendell, did you ever ask Shelly if she was working from home still?

A.    No.

Q.    Let me ask you this.  The incident that came up on the time card and which caused you to go to human resources, did Shelly receive the overtime pay for those hours?

A.    I'd say no.  That would have been the fourth or fifth occurrence after being told cease and desist after the first one and again after the second or third one.

Q.    And then after that, you never heard anything about working from home?

A.    From Shelly?

Q.    From Shelly.

A.    No.

Q.    From anybody else?

A.    no.

14

Q.      No other employees in the plant?

A.      No.  Shelly never came to me and said, "I'm continuing to work overtime at home."  Very seldom, but it did occur every quarter, once every three months or so, I'd see an email that would indicate she had been working at home.

Q.      And how would that be indicated?

A.      There would be an attachment, an Excel spreadsheet or something attached.  And that was – but very infrequently was I either an addressee or CC'd on an e-mail.

Q.      How did you know from the email that she was working from home?

A.      Because it would come from her home email, not from an Alsco or Aleris address.

Q.      Would that email have a time on it?

A.      Yeah.  Emails have times, sure.

Q.      I'm trying to figure out how you – what you knew about the email, when it was sent, things like that.  I mean, did it say like 8 o'clock at night and you knew that Shelly wasn't in the office?

A.      Well, yes.  And then if it came from angel.com or I don't remember exactly what her email was, angel something.

Q.      Angel something.

A.      Okay.  I knew it was from home.  You know, obviously it wasn't an internal email.  But that was, you know, every three months or so.  *So, you know, then I'm drawing the assumption that she's not working overtime at home.  She just took something home, plopped it into a spreadsheet and sent it back*.

Q.      Did you ever ask her about that?

A.      I'd say yes.  I think I probably would have.

Q.      Do you specifically recall doing that?

A.      I know at least once I asked.  I've got this email.  She says, "Oh, yeah, I took this home just to finish it up and I sent it back."  I says, "Okay."  There was no mention, "Hey, I worked three hours on it,

15

I'm going to put it on my time card," no mention at all of that.  She took something home to finish it and emailed it back.

Q.   So you spoke with her about it once after Barbara Wendell, and you brought Barbara Wendell in the picture sometime around August 2005?

A.   Correct.

Q.   August or September 2005, somewhere in there?

A.   In that general area, yes, yes.

Q.   And then once after that you spoke with Ms. Blakley about working from home?

A.   Correct.

Q.   And you knew that she was working from home?

A.   at one time.

Q.   And then in addition to that, about every quarter you'd see an email from the angel email address?

A.   That's my estimation.  I'm just using a quarter as a definitive amount of time.  I want to say every three months maybe, give or take.  It might not have been.  It might have been four or five I'd see something from angel, whatever.

         THE WITNESS:        What was your email?

         MS. BLAKLEY:        Angeleyes.

         THE WITNESS:        Angeleyes, that's right.  That was in the Clint Eastwood movie.

A.   Anyway, I'd see something from angeleyes on a very infrequent basis.

Q.   And that led you to believe that she sent it from her home computer?

A.   Yes.

16

Q.      You said there would be like an Excel attachment, Excel spreadsheet attachment?

A.      Yes.

Q.      Is that normally what you would see in those emails that you would receive?

A.      Yes.  Something that you could do at home without having access to the company's website or to our server.  Our server was located in Beloit, which is, you know –

Q.      She wouldn't have access to the server outside of the Beloit facility?

A.      Correct.

Q.      Did you?

A.      No.

Q.      Were there any other times that you – strike that.  Did Shelly ever say to you, you know, "I've been working from home"?

A.      No.

Q.      Did you ever say to Shelly, "You can work as late as you want or from home as long as you want, but I cannot pay you anything over 40 hours a week"?

A.      No.

Q.      Did you ever say, "I cannot pay you anything over 40 hours a week"?

A.      Yes, with the qualification like we discussed earlier.  If we agreed to the overtime in the plant, there were instances where she worked it and she was compensated for it and it should be on a time card.  So the situation – it's not 40 hours period for three years.  If you look at the time cards, they'll show that she worked overtime as needed, as authorized, and Alsco compensated her for that overtime.

17

(Gilliam Dep. 51-55).[12]

Because nothing in the developed Rule 56 record raises a genuine issue of material fact of Alsco's constructive knowledge of Plaintiff having worked off-the-clock overtime, and nothing in the accumulated Rule 56 record demonstrates such constructive knowledge on a workweek by workweek basis, Defendant is entitled to judgment as a matter of law.

### d.      The absence of FLSA "willful" violations.

Plaintiff readily concedes that the statute of limitations for a Wisconsin "overtime" wage claim is two years, and thus liability in this dispute can only span back as far as April 15, 2006 (Pl. Opp. Br., p. 28).  Whether federal FLSA liability can transfer back as far as three years upon a demonstration of "willful" violations is an issue that is also ripe for summary judgment.  *Hower v. City of Springfield*, 274 F.3d 1141, 1144 (7th Cir. 2001) (affirming district court's summary judgment ruling that FLSA violations were not "willful").  "A two-year period is the norm, and a three-year period is the exception, and the burden is on the employee to show that the violation was 'willful'".  *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 310 (7th Cir. 1986).  To the extent Plaintiff disregarded explicit Alsco directions never to work "off-the-clock"; to record all of her work hours on her time sheet; to never work overtime that was not pre-approved; and, in an effort to stop Plaintiff from working from her home residence, stripped Plaintiff from access to a laptop computer, Alsco's asserted FLSA liability in this case cannot genuinely be labeled as "willful" under the FLSA.  Therefore, even if the Court determines there is a genuine issue of material fact with respect to the "merits" of

---

[12] *De minimis* work is wholly exempt from coverage under the FLSA.  *Pirant v. U.S. Postal Srvcs.*, 542 F.3d 202, 208 (7th Cir. 2008); *Frank v. Wilson & Co.*, 172 F.2d 712 (7th Cir. 1949).

Plaintiff's FLSA allegations, as a matter of law liability may only reach back to April 15, 2006.

**III.**     **CONCLUSION.**

For the reasons set forth in Defendant's opening Rule 56 Memorandum of law, as well as those stated here, Defendant Alsco is entitled to judgment was a matter of law.

Respectfully submitted,

*s/Keith L. Pryatel*

Keith L. Pryatel, Esq. (0034532)
kpryatel@kwwlaborlaw.com
John W. McKenzie, Esq. (0059266)
jmckenzie@kwwlaborlaw.com
Thomas Evan Green, Esq. (0075022)
tgreen@kwwlaborlaw.com
KASTNER WESTMAN & WILKINS, LLC
3480 West Market Street, Suite 300
Akron, OH 44333
330-867-9998 (Phone)
330-867-3786 (Fax)

Andrew M. Norman, Esq.
anorman@quarles.com
QUARLES & BRADY
33 East Main Street, Suite 900
Madison, WI  53703
608-283-2634 (Phone)
608-294-4974 (Fax)

Counsel for Defendant,
Alsco Metals Corporation

**CERTIFICATE OF SERVICE**

I hereby certify that on December 1, 2008, I caused to be served a true and correct copy of Defendant Alsco Metals Corporation's Reply Memorandum of Points and Authorities in Support of its Motion for Summary Judgment via email through the Court's electronic filing system, on:

>Larry A. Johnson, Esq.
>Cross Law Firm S.C.
>845 North 11th Street
>Milwaukee, WI  63233


>*s/Keith L. Pryatel*
>Keith L. Pryatel, Esq.